Thank you, your honors. May it please the court, my name is Guy Beckett and I represent the appellants Woods View II LLC and Darlene Piper. We're here to request this court to reverse the order of Judge Settle which dismissed the appellants claims under 42 USC section 1983 and the Fifth Amendment of the United States Constitution for takings based upon a series of events that in Kitsap County, the net effect of these events were to prohibitively delay the developers project and to prevent it ultimately from being constructed, notwithstanding the fact that the development met all development requirements that were imposed by Kitsap County. Now there are four essential elements that Judge Settle viewed and determined against the appellants and that was that, and looking over his order again this morning, the overriding theme of his decision was that the appellants claims were not ripe. But even if they were, Judge Settle determined, there was an insufficient showing of a violation of substantive due process and an insufficient showing of a violation of procedural due process. So those are the three constitutionally tangible items that are important for you to consider in evaluating this appeal. The fourth issue, which I do not intend to spend as much time on unless there's somebody who wants to find out about it, ask some questions about it, is the issue of Ms. Piper's standing. She was a member of the LLC and it is our position that Judge Settle's ruling in that regard that concluded that she had no standing to error because she had liabilities that were distinct from and different from those of Woods View and liabilities that Woods View did not have as a result of Kitsap County's conduct. What are those liabilities? What are those injuries? How are they separate from Woods View? She, in order to develop the property, she had to guarantee development debt and she had to guarantee materialman's debt. What isn't perhaps clear in the evaluation of the record is that there was actually development going on at the time that Kitsap County ultimately made its final and last concluding intervention into the development ability of this construction when it notified the legacy group, the loan company, that there would be more development appeals and more county processes that Woods View 2 would have to pursue in order to complete the project. I think it's pretty clear from a view of the record that Kitsap County, despite the fact that this development met all the standards, did not want the development to occur. And what they did, and there's evidence of this in Brent Ely's first and second declarations in the record, Kitsap County lied to the legacy group, and Ely was the person in charge of the legacy group for this, Kitsap County lied to the legacy group about the ability of Woods View 2 to be able to begin development processes right away by saying that there would be more hearing examiner meetings, there would be more appeal processes, and in fact, they might not be able to get a building permit for any of the homes that were to be constructed out there. So to wrap it up, there was already construction going on in reliance on the commitment letter that the legacy group had provided, and Darlene Piper, on her own, without Woods View's obligation, guaranteed materialman debt. And now George Johnson... Was that really a lie by the county, or was it a statement of their point of view that the growth principles inherent in the laws present in Washington state had to be read into or lay upon the development zoning vested rights that existed in the county vis-a-vis Woods View? Okay, well, those are two distinct issues as far as this record is concerned. Because the county has argued, hey, all we were doing was worrying about the Growth Management Act and the comprehensive plan. Well, that concern was not a legitimate concern, because there's well-established case law in Washington that says that if the development complies with the zoning ordinance, then the comprehensive plan cannot override that development ability, and the Growth Management Act cannot be applied on a site-specific basis to prevent development. And so... But that's not the issue that I'm talking about when I say the Kitsap County lied. Because although those two facts are true, the Kitsap County didn't have a legitimate purpose because neither the Growth Management Act or the comprehensive plan prevented this development or really had anything to do with this development, the county knew that anyway. Shelley Kneipp was the lead prosecuting attorney, and she, in her deposition, admitted that she knew of those decisions. But the thing that they lied to the Legacy Group about was once... What they told the Legacy Group was once the Department of Health approved the request for loss management change, that that would trigger more hearing examiner appeals or revisiting by the hearing examiner into the development approval that had been provided by the hearing examiner a year earlier, and that they would not issue building permits. Now, those are lies because the SDAP had been approved in 2007, and the citizens had appealed that approval, but that appeal ultimately was unsuccessful. But the SDAP was approved only... It was approved subject to the Department of Health's permitting of a loss system, but there was nothing else about that loss. So there was nothing that said the loss had to be in a particular form, or it could only be a single-purpose loss, or anything. So once the county had approved the SDAP subject to the DOH loss approval, the county was out of it. Can I ask you just a more fundamental claim that goes to your procedural due process claim or doesn't? You don't appear to argue or claim that Woodsview had a specific property interest in receiving a loss permit from DOH. Am I correct? That is correct. And how could the county's communications with DOH about a loss permit, and Karcher Creek and the Legacy Group regarding the proposed loss, how could any of that violate due process if there's no protected property interest? Well, because the county had no right to communicate anything about the loss. Well, you do not have a right to say I like your suit or I don't like your suit, but it's not a constitutional violation. It is, and here's why. Why in this instance? If you had, as you just conceded, no property interest in the loss. No, she had a property interest in the county to develop the property as it was permitted at the time. Under the SDAP and the SIPA. 78 single-family units. Okay. But you just said there was no specific property interest in receiving a loss. So how can there be a constitutional violation concerning anything to do with that? Because they were not, okay, well, there's two issues. The procedural issue is they were not communicating to Woodsview to their efforts to prohibit the development that they were on one hand saying was on focus and on target to be developed for a 78-unit development. At the same time, they were saying and going through the apparent public process of saying we are approving the development for 78 single-family homes. They were going behind everyone's back and in a hidden and nefarious way to the Department of Health saying we don't want this development to occur. It complies with all our regulations. You are the one that needs to prohibit this development from happening. Well, nobody was telling Ms. Piper and Woodsview, too, that this behind-the-scenes procedures were going on. But doesn't the county have the right to petition other governmental agencies and to advance the interest of their constituencies as they see it? No. Because it, no, not when the proposed development meets all standards imposed by the county, it was not violative of any methodology or procedure or regulation that the county had. It was, everything about it was fit for approval. And in addition, the county had no right to do that because it knew that the Growth Management Act could not be applied to prevent this development from occurring. And it knew that its zoning ordinance permitted it and its comprehensive plan was only a guide and, therefore, the zoning ordinance trumped. So, no, it did not have the right to tell the Department of Health, we are trying to prevent this development from occurring and you need to help us. Because it complied with all the county requirements. And so, if a citizen went to the Department of Health and said, you shouldn't issue this loss because I think it's too much growth, that would, well, obviously they're not acting for the state, but they had no right to do that? No, a citizen does have a right to do it. But a government does not have that same right to prevent one of its constituents from fulfilling the terms of a permitted use. The county could not. So, there was no legitimate government interest in what Kitsap County was doing at all? None. Because the comprehensive plan did not apply to prevent it. And the hearing examiner still found. The Growth Management Act did not, could not be applied specifically to prevent it as the hearing examiner still found. And as the Superior Court judge who ultimately upheld the hearing examiner's decisions held, and as the lead prosecuting attorney who put the whole scheme together, who put the plan together to derail the project, she knew it as well. In fact, in her email, and this is pretty critical. In her email that she wrote to her colleagues setting out the scheme to make this development not be permitted by the Department of Health, she said, we have no ability to prevent this from happening. The only way we have to do it is to contact the Department of Health and tell them it doesn't comply with our land use standards. But they knew it did. But no, they had a view that the Growth Management Act overlaid onto these vested rights in the plots. And they were not alone, were they? Wasn't a similar view expressed in an administrative ruling that's called Harless versus Kitsap? Didn't that, admittedly, it's not the Supreme Court of Washington, but it suggests that this is not a completely groundless or baseless argument. And that's really the standard, isn't it? No, it's not. Because if the government imposes requirements for a citizen like Woodsview II and Darlene Piper to meet in order to fulfill its approval, then it can't go behind the scenes to prevent those standards from being implemented by the developer. But they weren't, you're conflating two different activities of the county. One is their obligation to process her applications under SDAP and CFA. And while, admittedly, they were very slow in doing that, and you may have some claims or remedies about that delay, that's a duty they had, and they fulfilled, albeit slowly. They also have the right to represent, don't they, the interests of their constituencies and to speak to other agencies whose decisions they cannot control. Not when they're trying to prevent a development from occurring when that development meets all the requirements and standards imposed by that county. The county had nothing to do, it had no role at all, and it had no jurisdiction to have anything to do with the law system. It wasn't, it wasn't its issue. But what about, I think it's Manatee Sea or a case something like that, which says that a governmental entity, just like private citizens, has the right to advance the interest of their constituents in arguing to other governmental entities about what those second governmental entities ought to do vis-a-vis their responsibilities. Here, DOH deciding whether Woods View properly qualified for a loss. There's a couple distinctions. First off, that is not necessarily the be-all and the end-all standard. The Supreme Court has indicated that municipal governments don't really have First Amendment rights on a par with their citizens and constituents. Second, the situation you're describing. What case would that be? That was the concurrence by, in, I'm sorry, I don't, I'm not. That's fine, go ahead. It's in my reply brief in the discussion of the Noor-Pennington Doctrine. I'm sorry. That's all right. No, no problem. No problem. But there, but it was a concurring opinion, and then there was a couple sites that followed that. But it's also a distinguishing characteristic in that, in the case you're talking about, I don't believe that the government was, under the guise of acting in its own constituents' interests, circumventing their own regulations and approval methodologies to prevent the third-party applicant from getting what they were entitled to get as a vested right through the county, which is the situation here. Now, if all, if there was nothing else going on, and somebody wanted to build a home, a commercial building, let's put it this way. Let's say somebody wanted to build a commercial building in an area zoned only for single-family residences, and there was nothing that indicated that that property, that the developer had a vested right to do that, like occurred here, certainly the county would have the right to say, it's our constituents' interests that, you know, let's say that they went to the Department of Health for a septic approval or something. It's our constituents' interests that this not, that a commercial building not be put in a single-family residential area, and therefore, we, we, Cresce, do not approve that. But that's not the situation here. The county would have the right to do that in that situation, because there's nothing that would give the applicant in that situation a vested right to get what the county was trying to prevent from occurring. I understand your argument. Okay, well, I, you know, I mean, let's be honest with you. Just before you sit down, has Washington State had the opportunity to review your takings claim? Well, okay, so what happened was, again, just procedurally, we filed the lawsuit to begin with in the Superior Court, and Kitsap County removed it. And then Judge Settle just made his ruling dismissing the claims. And under the applicable federal statute, we refiled our lawsuit for all the state claims in state court. And we haven't had an ultimate disposition of that case, but the takings case is still in existence. And a motion for summary judgment was filed by Kitsap County, and that motion was denied. So that's where we are. We have a, I think we have a January 2013 trial date. And I'm amazed that we've only got a minute. I mean, we're done. How did that happen, right? Thank you. I appreciate your time. And we ask that you reverse Judge Settle and reinstate the case. Good morning. May it please the Court. My name is Mark Johnson. I represent the defendants in this case, the respondents. And we're asking this Court to affirm the decision of the trial court granting summary judgment. There were multiple grounds supporting summary judgment in this case. First, with regard to the claims of Darlene Piper, Judge Settle properly determined that she had no standing. She was not the applicant for the permits that are the subject of the lawsuit. She was not the property owner. She was a member of a corporation, a limited liability corporation. And she chose to guarantee the obligations of the limited liability corporation. But her claims were entirely derivative of the LLC's claims. An LLC, of course, is a separate legal entity. Our argument is also that standing is particularly appropriate in the absence of standing in this case because we're dealing here with federal due process and takings claims. A due process claim could only arise if Ms. Piper had, in fact, applied for something and had a right to process. Since she did not have any applications to the county, there was no process that was due her, much less due process. And certainly, she didn't own the property, so her property couldn't have been taken. So the Court properly dismissed her claim. The Court also properly dismissed the due process claims under Section 1983 and the takings claim for a variety of reasons. First, bear in mind, the county issued all of the permits that were requested of it. And with respect to a delay, yes, it took a while. But remember, this was in the go-go era of 2006, 2007, when everyone was applying for development permits. The county was swamped. And there's no evidence that the county treated this application any different than any other. Are you still arguing that Woodsview can't satisfy the final decision rule because the decisions at the county level on the SDAP and SEPA were ultimately in their favor? Well, as I understand the law, we're arguing that the claim is still not ripe because there was no challenge to anything the county did until years later. I mean, the county issued its permits in 2007. The lawsuit was filed in 2010. But aren't the claims here by Woodsview that there was an inordinate delay, unreasonable delay, delay violative of Washington's statute? Well, I don't think that those claims rise to the level of a due process violation here. At most, they're claiming we issued the permits and it took longer than they wanted. But there's no statute that mandates a particular time. But let's stick with the fundamental question, though. You wouldn't disagree with me that there was a final decision here in the approvals. And those approvals can still be actionable based on a theory of unreasonable delay. Would you agree with that? I think in theory that's correct. I don't think in this case there's any basis for it. But there clearly was no constitutionally protected property interest because at the time that the county was considering its permits, the SDAP and the SEPA, they still hadn't obtained the necessary loss approval from the state. That came later. And so they didn't have a property interest in developing the property until they got that approval from the state, which came much later. Well, if we could just put off loss for just a moment, would you agree that the state NORCO construction case held that a plaintiff has an enforceable right to a decision on an application within the statutorily defined period, which in that case was 90 as opposed to 78? Yes. So there is a legitimate claim of entitlement to a decision promptly under the statute. Except that what held this project up was the absence of the permit from DOH. And that's why the argument focuses on events that happened three years after the county's approval. That may be, but let me just get an answer to my question. Do you agree that Woodsview had a legitimate claim of entitlement to a decision on the two county applications within the state time periods? Not within the stated time periods. Those are guidelines. Those are not absolute time periods. It must be met. I thought it was a statutory 78 day period. Well, if that's the case, then virtually every permit is being considered. I represent counties all around the state, and it is very common not to meet those. Well, that may be, and maybe the plaintiff should have gone to court and got a mandamus. Maybe the plaintiff should have done something else. But I really want to just have an answer to the fundamental question that this plaintiff has a claim of entitlement to a decision within 78 days under Washington state law. I believe that they have a right to a decision in a timely manner. I would disagree with that time frame. Do you agree that the county failed to act within 78 days? Let me just pick a number out of the air. 78 days, I'm not recalling exactly, but I believe it took a good deal longer than that to get the permits in part because the information that was provided by the applicant wasn't sufficient, and they were sent back to get more as is typical in virtually all of these complex cases. But the fundamental point is they couldn't develop the property until they had the septic system approved from DOH. So even if they had a right to get their SDAP sooner, they're still looking at years before DOH finally approved. And then they went back, by the way, and modified their application for loss. So even after they went through the entire appeal process in 2008 and 2009 with neighbors opposing their application, then after they got the final approval from the court, they decided to go back and start all over again, at least with respect to the DOH decision. They went to DOH. Mr. Johnson, this is Barry Silverman in Phoenix. I wonder if I could ask you a question. Mr. Beckett's sort of overriding point is that, as I understand it, is that the county has every right to make sure that all of the county's I's are dotted and T's are crossed. But it has no right to sabotage the application vis-a-vis other agencies such as with the state. What's your answer to that? Yes, Your Honor. In fact, the county is entitled to act as a provider of comments and opinions to another entity such as the Department of Health. This court has so held that it applies to local governments. The Manasseh case was mentioned. There's also the Song V versus City of Claremont case at 382 Fed 3rd 532, which involved facts very similar to this, where a local government was concerned about a development outside of an urban growth area because of the septic system. And it was held that they had absolute Norr-Pennington immunity from liability for comments they made. Remember, we were not the decision maker. We were simply the one that was providing our view of the law that the Growth Management Act provided guidance to the Department of Health. Now, the Department of Health ultimately disagreed with our decision. And in fact, they disagreed with the county's decision back in 2008. And they decided that they felt that they were not prohibited from approving this loss. But certainly, the county was entitled under the Norr-Pennington rule to express its legal opinion. That opinion was no mystery to Woodsview, too. The suggestion that she didn't know what was going on behind the scenes is ridiculous. She wrote a letter to the governor back in 2006 or 2007 complaining that the county had expressed this view that such loss proposals shouldn't be accepted in the rural area. So, she was aware. Would you remind me to bring up the Norr-Pennington doctrine and the motion for summary judgment stage? Your Honor, at the summary judgment stage, we mostly focused on the state immunity statute, which, as it was refined by a court decision, indicated that it doesn't apply to a city or local government. So, you know, theoretically, actually, we did not mention. Let me ask my question again. Did you raise the Norr-Pennington doctrine at the motion for summary judgment stage? No, Your Honor. We raised it in our response brief. And it was responded to in the reply brief here. We could go back to trial court and raise it again. We did not raise it at the trial stage. That's correct. And why isn't that waived? Because it was addressed by both parties before this court. Counsel addressed it and made arguments, cited cases, saying even if it was raised. And, you know, excuse me, immunity was raised, simply the Norr-Pennington rule was not specifically cited. And so, we would just, you know, since the issue has been teed up and it has been addressed by both parties here, it seems unnecessary to send it back if this court is so inclined to the district court for it to be raised in a subsequent motion for summary judgment. Well, normally, we say you tried the case in the district court. We don't send it back because you forgot to do something. Okay. But then anyway, thank you. You bet. With respect to. Wasn't, if I could just follow up on the judge's questions about Norr-Pennington. My recollection is that the summary judgment came before the close of discovery. And certainly, on your defense of Norr-Pennington, you know, was his sham communications. The appellant has argued there's misrepresentations. I mean, isn't he allowed to develop that record? No. Summary judgment is frequently granted in these cases. If you read the case that I just mentioned, Sangi v. City of Claremont, there's much more extreme lobbying that was going on. In our case, the only thing that we did in this relevant time period of September 2009, we sent a few e-mails to the Department of Health, which they said they disregarded. And if you look towards the end of my brief, we quote actually from the decision-maker at DOH where he didn't even know we had made, had complained about the loss. So it was full discovery on all communications between your clients, all your clients, and anyone at DOH or at the state level? There have been depositions of probably 12 county employees and all of the important members of the Department of Health, and those are included in the record. Would you respond to your opponent's arguments that there were misrepresentations made by the county and its actors to DOH? Well, that is simply incorrect. Our employees, our officials, our honorable people who believe genuinely that the Growth Management Act does not allow this kind of dense development served by a large on-site septic system in a rural area. Bear in mind the zoning here is one unit per five acres, and what they were planning to do was put 78 units into effectively about a 19-acre site. So they were increasing the density by approximately 20 times what would be allowed under current zoning. The county genuinely believed and had been sanctioned by the Washington Growth Management Hearings Board for allowing too much development, dense development in the rural area. They had literally been sanctioned and been held out of compliance with GMA. They were saying, in fact, they wrote to the state and said, hey, you're putting us in a bind here. On the one hand, you're saying we're violating GMA by allowing these kinds of developments. On the other hand, we're being told that these kinds of developments must be approved. And so the county was expressing a valid legal opinion. Bear in mind it was a legal decision. And if you look at the communications and the declarations of Mr. Ely, remember this talk about the discussion with the potential lender, he doesn't say that we said there would be no approval of this loss. What we said is we didn't know. DOH was making the decision. There could be additional appeals. That was an absolutely true statement. Of course there could be appeals because the neighbors had appealed every decision. They appealed the decision of the Department of Community Development. They appealed the decision of the Board of County Commissioners, all of which were in favor, by the way, of Woods View, remember. The neighbors appealed at every stage. So when we said, do we know if there will be additional hearings? We don't know. There could be. And in fact, if Woods View had not received their approval of the DOH, it's likely they would have appealed. So everything the county said was absolutely true. And to the extent it was incorrect, and I'm not sure that it was, it was a mistaken interpretation of what the GMA allows and what it does not allow. You basically come down to the fact that, and we argued the absence of proximate causation, which I realize is difficult to show on summary judgment. But in this case, it really does apply. Because until they got that approval from DOH, they simply could not build these homes. Our approvals came in 2007. DOH did not make its approval until August of 2010 on the modified loss approval. The North Pacific case at 526 Fed 3rd 478 dismissed a claim as a matter of law where the delay was, in effect, was attributable to a state agency that hadn't made its decisions. In other words, it held that a government cannot be liable for delay damages during the period of time that a state agency is. But that begs the appellant's argument that it isn't just that you were slow in granting your petitions or applications, but you interfered with a loss being issued. You interfered with the state process. That is not a violation of due process. It is not a violation of due process for someone to send a comment. And I would defy counsel to identify any case which has held that someone providing a comment to another agency, decision maker, can violate that person's due process rights. Or take his property. And that's the fundamental thing. You can say, well, this wasn't good. You shouldn't have done it. But it's not a violation of due process. Woods' view had ample process and ample procedure. And our comments were in the record. There was no violation by us of due process. And there was no taking by us simply by saying to the state, in three short emails, by the way, over a period of about a week, saying, gee, we don't think that, we think you should take a closer look at this. This may be violative of GMA. That's not a taking by Kitsap County. And that is not a violation by Kitsap County of due process. We're not the decision maker. We're somebody providing legal opinions and opinions by state agencies and by Department of Ecology and by Fish and Wildlife. Those things are done routinely in land use applications. If each of those subjects the person providing the comment to liability for due process violation or for a taking, then taking is expanded to the point of absurdity, I believe. So these are not federal constitutional claims. At most, they are state claims that are remaining if they believe there was a misrepresentation. And they have alleged that in the state court. But these are not due process violations or takings by Kitsap County. Thank you. Thank you. I'll give you two minutes. I'm surprised. I appreciate it. The case that I referred to was the Columbia Broad Systems, Inc. versus Democratic National Committee, where Justice Stewart concurring said the First Amendment protects the press from governmental interference. It confers no analogous protection on the government. There is no definitive ruling anywhere that says the Norr-Pennington Doctrine applies to municipalities as an entity as opposed to its employees. The Norr-Pennington Doctrine has been passed and developed and the case law has developed to protect employees individually, but not the municipality as a whole. Because if the municipality is permitted in cases like we have here to go around and essentially act in a manner that is not open, then we have, I don't want to be hyperbolic, but then we can't trust the government to do anything. This is about as untransparent of a government process that one could ever want to see. On the one hand, they're requesting the applicant to pay hundreds of thousands of dollars for development expenses and for reports that were for the purpose of determining whether this development should be developed for 78 units. She guaranteed debt for road improvements to serve 78 units. She paid for reports and engineers' materials to complete those processes. All the while, the county was going behind her back, trying to get the state not to approve this for a 78-unit development. So she puts out hundreds of thousands of dollars, and Woodsview, too, puts out hundreds of thousands of dollars in reliance on the county's good processes, all the while unknowing that they're trying to cut the legs out from under her. Now, I understand. Two minutes. No, you're, it's, they're over. Yes. Okay. I understand. Two minutes. So thank you very much. Thank you. And we, I request that you reverse Judge Settle's opinion, which we believe to be erroneous. Thank you very much. Thank you. Thank you.
judges: Hall, Silverman, Murguia